JUDGE FORREST

# 14 CV 0038

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

SILOGRAM LUBRICANTS CORP.
D/B/A ROYAL LUBE CO.,

        Plaintiff,

v.

STEVAN JOSPEY, LUIS LEBRON, ENCORE
PETROLEUM, LLC, CARLOS ROMERO,
JUAN QUILA-MORAN, HERMINO LOPEZ,
WILLIAM BRYANT III, PHOEBE FERENTZ,
ANTOINETTE RIZZICA, ALISON SAVO, GARY
MORAN, MORRIS WILSON, GINGER BERENS,
ROSALYN JOSPEY, GRACE JOSPEY,
CITILUBE, INC., GREGORY BASS;
NORTHEASTERN FUEL, RICHARD D'AURIA,
ADVANTAGE ENVIRONMENTAL, and
JOHN AND JANE DOES, 1 THROUGH 20,

        Defendants.

--------------------------------------------------------x

Civil Action No. 14-CV-0038 (KBF)

**COMPLAINT**



Plaintiff Silogram Lubricants Corp., d/b/a Royal Lube Co., a New York corporation

("Silogram" or "Plaintiff"), by and through its undersigned attorneys, hereby alleges as follows:

## JURISDICTION AND VENUE

1.    This is a Complaint for (i) violations of the Lanham Act, 15 U.S.C. § 1114

(trademark/tradename infringement); (ii) violations of the Lanham Act, 15 U.S.C. § 1125(a) (false

designation of origin, unfair competition); (iii) misappropriation of trade secrets; (iv) common law

unfair competition; (v) trademark/tradename infringement under New York Law; (vi) unfair

competition under New York Law; (vii) false advertising; (viii) breach of contract; (ix) tortious

interference with business relations; (x) conversion; (xi) breach of fiduciary duty; (xii) an

accounting; (xiii) faithless servant; (xiv) aiding and abetting breach of fiduciary duty; (xv) fraud;

(xvi) aiding and abetting fraud; and (xvii) an injunction.

2.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(b). The Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy as the federal law claims.

3.    The Court has personal jurisdiction over the Defendants because Defendants are either located or conduct business in New York State or have committed torts affecting or within New York State. In addition thereto, the Defendants have purposefully availed themselves of the opportunity to conduct commercial activities in this forum, and this Complaint arises out of those activities.

4.    Venue is proper in this District pursuant to 28 U.S.C. 1391(c) because a substantial part of the events giving rise to the claim occurred, and continue to occur, in New York.

## NATURE OF THE ACTION

5.    This action seeks to remedy systematic criminal activity and civil torts committed by Stevan Jospey, acting individually and in concert and cooperation with the co-Defendants, including the Defendant, Luis Lebron, a former employee of Silogram and nominal owner of the co-Defendant, Encore Petroleum, LLC, aimed at stealing all value from Silogram and ultimately destroying the company. As will be detailed in this Complaint, Defendant Stevan Jospey used his relationship as nephew to the Plaintiff's aging President and sole shareholder, Oscar Margolis, and his unmitigated self-dealing, deceit, threats, intimidation and other wrongful acts to first take on the position of Vice-President, reportable to nobody other than Oscar Margolis, and then ultimately taking effective absolute control over the entire company. He then utilized that control, in flagrant violation of the fiduciary duties he owed Silogram and its shareholder, to commit wanton acts of theft, waste and mismanagement. Finally, when there was little left to steal, when the scope of his

2

misconduct came to light, and when preventative actions were being instituted to remedy them, Stevan Jospey while still employed at Silogram, and subject to a non-compete agreement, entered into a criminal enterprise with the Defendant, Luis Lebron, and other current and prior employees of Silogram, to steal its remaining customers and tarnish and destroy its remaining business.

## THE PARTIES

6. Plaintiff is a New York corporation which maintains its principal place of business at 180 West 5th Street, Bayonne, New Jersey 07002, and which maintains an office for the transaction of business at 1000 South Avenue, Staten Island, NY 10314.

7. Defendant Stevan Jospey ("Jospey") is an individual residing at 25 Anaconda Street, Staten Island, New York 10312.

8. Defendant Encore Petroleum, LLC ("Encore") is a Limited Liability Company conducting business in the state of New York, with its principal place of business located at 679 Kennedy Blvd, Bayonne, NJ 07002.

9. Upon information and belief, Defendant Luis Lebron ("Lebron") is an individual residing at 120 Sicamore Road, Jersey City, New Jersey 07305.

10. Upon information and belief, Defendant Lebron is the Vice President of Sales and Business Development for Silogram, and is currently the President of Defendant Encore.

11. Upon information and belief, Defendant Carlos Romero ("Romero") is an individual residing at 98 West 17th street, Bayonne, New Jersey 07002.

12. At all relevant times, Defendant Romero was employed with Plaintiff Silogram as a factory worker. Upon information and belief, Romero is now an employee of Defendant Encore.

13. Upon information and belief, Defendant Morris Wilson ("Wilson") is an individual residing at 81 Jersey St APT 1G, Staten Island, NY 10301.

3

14.    At all relevant times, Defendant Wilson was employed with Plaintiff Silogram as a factory worker.  Upon information and belief, Wilson is now an employee of Defendant Encore.

15.    Upon information and belief, Defendant Juan Quila-Moran ("Quila-Moran") is an individual residing at 650 Palisade Avenue, Jersey City NJ 07307.

16.    At all relevant times, Defendant Quila-Moran was employed with Plaintiff Silogram as a truck driver. Upon information and belief, Quila-Moran is now an employee of Defendant Encore.

17.    Upon information and belief, Defendant Hermino Lopez ("Lopez") is an individual residing at 6131 Grand Avenue, #12D, North Bergen, New Jersey 07047.

18.    At all relevant times, Defendant Lopez was employed with Plaintiff Silogram as a truck driver. Upon information and belief, Lopez is now an employee of Defendant Encore.

19.    Upon information and belief, Defendant William Bryant III ("Bryant") is an individual residing at 1016 Broadway, #315, Bayonne, New Jersey 07002.

20.    At all relevant times, Defendant Bryant was employed with Plaintiff Silogram as a sales representative.  Upon information and belief, Bryant is now an employee of Defendant Encore.

21.    Upon information and belief, Defendant Phoebe Ferentz ("Ferentz") is an individual residing at 86 West 27th Street, #4, Bayonne, New Jersey 07002.

22.    At all relevant times, Defendant Ferentz was employed with Plaintiff Silogram as a sales representative. Upon information and belief, Ferentz is now an employee of Defendant Encore.

23.    Upon information and belief, Defendant Antoinette Rizzica ("Rizzica") is an individual residing at 39 Ludlow Street, Staten Island, New York 10312.

4

24.    At all relevant times, Defendant Rizzica was employed with Plaintiff Silogram as a sales representative. Upon information and belief, Rizzica is now an employee of Defendant Encore.

25.    Upon information and belief, Defendant Alison Savo ("Savo") is an individual residing at 97 West 21st Street, Bayonne, New Jersey 07002.

26.    At all relevant times, Defendant Savo was employed with Plaintiff Silogram as a sales representative. Upon information and belief, Savo is now an employee of Defendant Encore.

27.    Upon information and belief, Defendant Gary Moran ("Moran") is an individual residing at 473 Edgewood Place, Rutherford, New Jersey 07070.

28.    At all relevant times, from August 2009 until October 2013, Defendant Moran was employed with Plaintiff Silogram as an office sales representative selling lubricants and fuel. Upon information and belief, Moran is now an employee of Defendant Encore.

29.    Upon information and belief, Defendant Ginger Berens ("Berens") is an individual residing at 1135 Ralston Road, Apt. 221, Arvada, CO 80004.

30.    At all relevant times, beginning in or about 2004, Defendant Berens was employed with Plaintiff Silogram as a sales representative, originally inside office sales and subsequently sales by phone from Colorado. Upon information and belief, Berens is now an employee of Defendant Encore.

31.    Upon information and belief, Defendant Rosalyn Jospey ("Rosalyn") is an individual residing at 215 Carlyle Green, Staten Island, New York 10312.

32.    At all relevant times, Defendant Rosalyn was employed with Plaintiff Silogram as an office manager. Upon information and belief, Rosalyn is now an employee of Defendant Encore.

33.    Upon information and belief, Defendant Grace Jospey ("Grace") is an individual residing at 63 Cherrywood Court, Staten Island, New York 10308.

34.    In 2010, Defendant Grace was employed with Plaintiff Silogram as an office manager and sales representative.  Upon information and belief, Grace is now an employee of Defendant Encore.

35.    Upon information and belief, Defendant Richard D'Auria ("D'Auria") is an individual residing at 20 Paradise Place, Staten Island, New York 10307.

36.    At all relevant times, Defendant D'Auria was the owner of Defendant Northeastern Fuel NY Inc.

37.    Upon information and belief, Defendant Northeastern Fuel NY Inc. ("Northeastern") is a fuel oil company conducting business in the state of New York, with its principal place of business located at 414 Spencer Street, Staten Island, NY 10314.

38.    Upon information and belief, Defendant Citilube, Inc. ("Citilube") is a corporation conducting business in the state of New York, with its principal place of business located at 136 Morgan Avenue, Brooklyn, NY 11237.

39.    Upon information and belief, Defendant Gregory Bass ("Bass") is an individual residing at 16461 NE 29th Ave., N. Miami Beach, FL 33160, and is the owner of Defendant Citilube.

40.    Upon information and belief, Defendant Advantage Environmental Corp. is a waste oil services company conducting business in the state of New York, with its principal place of business located at 395 Rte. 34, Matawan, NJ 07747. (Defendants Lebron, Romero, Wilson, Quila-Moran, Lopez, Bryant, Ferentz, Rizzica, Savo, Moran, Berens, Rosalyn, and Grace shall collectively be referred to herein as the "Former Employee Defendants" and together with

Defendants Jospey, Encore, D'Auria, Northeastern, Citilube, and Advantage Environmental, Collectively the "Defendants").

## BACKGROUND

### A.   Silogram's Business

41.   Silogram is a family owned business founded over 100 years ago, offering oil and grease, blending and compounding, and related services and products on behalf of its clients (the "Lubricant Services").

42.   Silogram provided Lubricant Services to the automobile trade, transportation industry and other related businesses and users throughout New York, New Jersey and Connecticut.

43.   Silogram had through the years, at great cost and expense, developed and created a market for its products and Lubricant Services, which included thousands of separate customers.

44.   Silogram had carefully and deliberately maintained its reputation for providing quality products to these customers, which are in turn used and/or sold by such customers in their respective businesses.

45.   The reputation and customer base developed by Silogram had enormous value to Silogram and was among its most valuable assets.

46.   Silogram had continually used the registered trademarks "Silogram", "Silogram Lubricants", "Silogram Lubricants Corp.", and variations of same at all relevant times in connection with its business.

47.   Silogram's customers, and the general public, came to recognize Silogram as an established and successful provider of Lubricant Services.

## B. Jospey's Employment at Silogram and Domination of the Business

48. The Defendant, Jospey, was first employed by Silogram in 1991, in the capacity of operations manager, and remained in that position until 2003.

49. In or about March, 2003 Defendant Jospey left Silogram to work for a competing company, Prime Lube, in Cateret, New Jersey.

50. In 2005, Defendant Jospey was rehired by Silogram based on his representations that he could grow the business, and assist in the transfer of the business to the next generation.

51. Provided he met expectations and acted in Silogram's best interests, Defendant Jospey had an expectation that he would be offered the opportunity to purchase an equity interest in the company.

52. At the time of Stevan Jospey's rehire, Oscar Margolis was the sole shareholder, officer and director of Silogram, was in charge of its day-to-day operations and worked at the company on a full time basis.

53. The Defendant Stevan Jospey, following his rehire, took advantage of Oscar Margolis' increasingly severe health problems, his stated wish to transition into retirement and the fact that he was devoting less time to the business, to wrest control of all aspects of Plaintiff, Silogram's, operations.

54. In connection with same, Defendant Stevan Jospey: (i) instructed all employees that as operations manager he was solely responsible for all decisions at the company; (ii) fired employees that he deemed able or willing to oppose his directions and/or report unlawful or inappropriate behavior to Oscar Margolis; (iii) employed individuals who were aligned with his interests, including his mother, Defendant Roslyn Jospey, and former wife, Grace Jospey; and (v) engaged in bullying, intimidation and sexually inappropriate conduct to create a hostile workplace

8

in which Stevan Jospey's personal interests and needs were made the sole priority and marker of workplace performance.

## C.   Stevan Jospey's Employment and Stock Purchase Agreement

55.     Stevan Jospey utilized his effective control of Silogram to convince Oscar Margolis that Stevan Jospey was indispensable to Silogram's success and Oscar Margolis' generational transition concerns.

56.     Stevan Jospey exercised his assumed power at Silogram to negotiate an employment agreement that made Stevan Jospey an officer of the company and granted Stevan Jospey an option to obtain an ownership in the company pursuant to a buyout, in exchange for Stevan Jospey's continued (purported) full time commitment to Silogram and agreement not to compete in the event of the termination of Stevan Jospey's employment.

57.     Following these negotiations, the Plaintiff, Defendant Stevan Jospey and Oscar Margolis entered into an Employment and Stock Purchase Agreement effective as of July 1, 2009 (the "ESPA").

58.     Pursuant to the ESPA, Defendant Stevan Jospey's employment could not be terminated, except for cause.

59.     Pursuant to the ESPA, Defendant Stevan Jospey assumed the official position of Vice President.

60.     In connection therewith, Section 2 of the ESPA provides, *inter alia*, expressly, as follows:

> (a)    **Position.** From and after the Commencement Date, and subject to the terms and conditions of this Agreement, Jospey shall be employed as Vice President of the Company. Jospey shall perform all of the duties reasonably and normally accorded to such position, as reasonably directed by Margolis, who is presently the Company's President. *Jospey shall report only to Margolis, whether he is acting as the President or in any other capacity*, it being the

9

understanding of the parties that Margolis shall be the only officer of the Company to whom Jospey shall report.

(b)    **Obligations.** *Jospey agrees to perform his duties faithfully and devote his full business time and attention to the business and affairs of the Company.* (Emphasis added).

61.    "For cause" termination, pursuant to Section 6 (A) of the ESPA, includes the following:

(i) Employee's failure or refusal to substantially perform Employee's duties and obligations in breach of this Agreement;

(ii) Employee's commission of a deceitful or fraudulent act in connection with Employee's employment resulting in substantial harm to the business income or assets of the Company;

(iii) Employee's conviction or any felony resulting in incarceration for a period greater than six (6) months;

(iv) Employee withholding information materially adverse to the Company's interests from any officer or agent of the Company resulting in harm to the business income or assets of the Company;

(v) Employee making any material misrepresentation to any officer or agent of the Company resulting in harm to the business income or assets of the Company;

(vi) Employee failing to carry out the instructions of Margolis in dereliction of Employee's duties with the Company; or

(vii) Employee failing to abide by or to enforce any policy or procedure of the Company, which failure would normally be considered grounds for the dismissal of any employee of the Company.

62.    In addition thereto, Section 10 of the ESPA included covenants prohibiting acts of wrongful competition and provided for a three year period of non-competition (and non-solicitation) following its termination.

63.    In connection with the foregoing the ESPA prohibited Defendant Stevan Jospey from, inter alia:

(a) [disclosing]…any confidential information relating to the business or prospects of the Company or a person to whom disclosure is reasonably necessary or appropriate in connection with the performance … of his duties as an official or employee of the Company, of any confidential information relating to the business or prospects of the Company, including, but not limited to, any information with respect to any of the Company's customers, products, methods of distribution, strategies, business and marketing plans and business policies and practices, including information disclosed to the Company by others under agreements to hold such information confidential…

(b) …own[ing], manag[ing], operat[ing], join[ing], control[ling], be[ing] employed by, consult[ing] with or participat[ing] in the ownership, management, operation or control of, or be connected with (as a stockholder, partner, or otherwise) any business competing with, or substantially similar to, the businesses of Company and its present and future subsidiaries, joint ventures, partners or other affiliates, as such businesses exist in any state of the United States of America in which the Company conducts its business as of the beginning of the Non-Competition Period…

(c) …hir[ing], solicit[ing], retain[ing], compensate[ing] or otherwise induc[ing] any individual who is an employee of the Company to leave the employ of the Company or in any way interfere with the relationship between any of the Company and any employee thereof, (ii) hir[ing], engage[ing], send[ing] any work to, plac[ing] orders with, or in any manner be[ing] associated with any supplier, contractor, or other business relation of the Company if such action … would have an adverse effect on the business, assets or financial condition of the Company, or interfere with the relationship between any such person or entity and the Company, or (iii) solicit[ing] or accept[ing] business from any customer of the Company…

64.     In the absence of a for cause termination, Section 5 of the ESPA provided for continuous employment by Defendant Stevan Jospey in his position as Vice President and, upon the earlier of the death, disability or retirement of Oscar Margolis, the purchase by Stevan Jospey of Oscar Margolis' shares (constituting all issued and outstanding shares) of Silogram.

65.     The purchase price under the ESPA pursuant to Section 5 was pegged to a percentage of the "Adjusted Gross Sales" of Silogram, calculated by subtracting the principal amount of all loans owed by Silogram from Silogram's revenues from the sale of goods and

services and payable pursuant to a promissory note providing for weekly installments of $4,500.00.

66.     Based on the foregoing formula, the purchase price under the ESPA was: (i) 25% for any calendar year in which Adjusted Gross Sales preceding the death, disability or retirement of Oscar Margolis were less than $6 Million; (ii) 30% for any calendar year in which Adjusted Gross Sales preceding the death, disability or retirement of Oscar Margolis were at least $6 Million, but less than $8 Million; and (iii) 35% for any calendar year in which Adjusted Gross Sales preceding the death, disability or retirement of Oscar Margolis exceeded $8 Million.

67.     The foregoing provisions had the effect of lowering the purchase price as revenues decreased and/or as debt increased.

68.     As will be set out in the detailed allegations that follow, Defendant Stevan Jospey, incentivized by (i) the buyout terms of the ESPA, (ii) that Oscar Margolis was aging, spending less time at work and suffering from increased health issues and (iii) Stevan Jospey's predatory predisposition towards self-dealing, embarked upon a series of actions constituting theft, waste and mismanagement, profiting grossly and unjustly at Silogram and its shareholder's, and ultimately creditors', expense.

69.     The actions taken by the Defendant, Stevan Jospey, in concert and cooperation with other named Defendants, known and unknown, were in wanton and willful violation of his fiduciary duties as an officer and operations manager of the Plaintiff, Silogram, as well as the express terms of the ESPA.

**D.   The Acts of Theft**

70.   The Defendant, Stevan Jospey, in concert and cooperation with other named Defendants, known and unknown, engaged in numerous acts of theft, the full extent of which is unknown and subject to an accounting.

71.   The means employed include: (i) diverting and converting rebates on waste oil pickups; (ii) using Silogram to pay American Express card charges for Stevan Jospey's personal, non-business related expenses totaling several hundred thousand dollars; (iii) purchasing railcar container loads of distillate and fuel oil, including shipments from, among other sources, Safety Kleen Systems Inc. (formerly a major supplier of product to Silogram) and diverting the product by the truckload to Defendant, Northeastern Fuel, and upon information and belief other unknown purchasers in the course of surreptitious nighttime deliveries; (iv) selling Silogram vehicles to Defendant Citilube which were unknown to Plaintiff and Oscar Margolis, filled with additives, base oils and viscosity improvers; and (v) deleting invoices from the computer system on cash orders and diverting the proceeds to himself.

72.   The foregoing acts were commenced prior to the formation of the Defendant Encore, an entity created and controlled by Defendant Jospey through his co-conspirators and nominees, including Defendant Lebron, for purposes of misappropriating Plaintiff's entire business, including without limitation its trademarks, trade names, trade secrets, customers, sales force, and good will.

73.   In furtherance of Defendant Stevan Jospey's acts of theft, Stevan Jospey used his operational control of Silogram to move Silogram into the fuel oil business on a large scale, whereas Silogram was historically predominantly engaged in the manufacture and distribution of lubricants.

13

74.    The purchase and sale of fuel oil gave Defendant Stevan Jospey substantially greater opportunities to steal by virtue of the following factors, all of which Jospey unlawfully exploited at Silogram's, its shareholder' and its creditors' expense: (i) the purchases initially increased Silogram's inventory and gross revenues obtained thereby allowing Stevan Jospey to leverage Silogram's relationship with its established vendors to take on more and ultimately unsustainable levels of credit; (ii) the increase in revenues provided cover for the acts of theft as the missing fuel and income to be derived from same was harder to detect and not immediately apparent to Silogram's bottom line; and (iii) unlike the sale of lubricants, the fuel oil could be sold on a cash basis to numerous small operators and residents and diverted by Stevan Jospey with little risk of detection.

   **(i)    Stolen Rebates.**

75.    In the ordinary course of and as a byproduct of Silogram's lubricant business, Silogram obtained certain "waste oil" and other materials from the return of empty drums from its customers (together, the "Waste Materials") that must be professionally disposed of due to environmental concerns.

76.    At all relevant times, Defendant Stevan Jospey was responsible for arranging the pick-up and disposal of Silogram's Waste Materials.

77.    At all relevant times, Defendant Stevan Jospey retained the services of Defendant Advantage Environmental to pick-up and dispose of Silogram's Waste Materials.

78.    Defendant Jospey was the only Silogram employee who had any contact with Defendant Advantage Environmental regarding the pick-up and disposal of Silogram's Waste Materials.

79.     During the period 2006 to 2013 (the "Waste Disposal Period"), Defendant Advantage Environmental would pick up Silogram's Waste Materials every two (2) to four (4) weeks.

80.     In addition to picking up and disposing of Waste Materials, Defendant Advantage Environmental pays its customers a rebate (the "Waste Disposal Rebate") for every gallon of Waste Material it picks up from its customers.

81.     During the Waste Disposal Period, Silogram never received a Waste Disposal Rebate from Defendant Advantage Environmental.

82.     Upon information and belief, Defendant Stevan Jospey caused Defendant Advantage Environmental to pay the Waste Disposal Rebates earned on account of Silogram's Waste Materials to Defendant Stevan Jospey directly (and/or to other persons or entities controlled by Defendant Stevan Jospey).

83.     Silogram's office manager, as well as others employed at Silogram, witnessed Defendant Advantage Environmental's regular pick-up of Silogram's Waste Materials.

84.     Each of Silogram's office manager, as well as others employed at Silogram, witnessed Defendant Advantage Environmental's employees paying Defendant Stevan Jospey in cash when Defendant Advantage Environmental would pick-up Silogram's Waste Materials.

85.     Subsequent to Defendant, Stevan Jospey's termination from Silogram in or about April 2013, Silogram began using the services of Lorco Petroleum Services ("Lorco") for the pick-up and disposal of Silogram's Waste Materials.

86.     The following chart provides detail regarding the amount of gallons of Waste Materials picked up from Silogram by Lorco during the period April 2013 through September 2013 and the rebates received by Silogram on account thereof:

15

| Date | Used Oil | Oily Water | Anti-Freeze |
|---|---|---|---|
| April 2013 | 825 | 0 | 0 |
| May 2013 | 1,050 | 0 | 800 |
| June 2013 | 300 | 200 | 0 |
| July 2013 | 300 | 250 | 0 |
| August 2013 | 0 | 0 | 0 |
| September 2013 | 450 | 0 | 0 |
| Total | 2,925 | 450 | 800 |
| Rebate | $2,047.50<br><br>($0.70/gallon) | $292.50<br><br>($0.65/gallon) | No Credit |

87.    As a consequence of the foregoing from 2006 to 2013, Jospey misappropriated

waste oil rebates, the full extent of which loss is unknown and subject to an accounting.

(ii).    **The Off-Hours Oil Theft Scheme**.

88.    During the period January 2005 through March 2013, Defendant Stevan Jospey,

acting in concert and cooperation with the Defendant Northeastern Fuel and Northeastern's owner,

the Defendant Richard D'Auria, arranged for the surreptitious deployment of Northeastern Fuel oil

trucks at Silogram's Bayonne New Jersey facilities and the sale of the fuel to Northeastern Fuel

and third parties, the identities of which are unknown at this time.

89.   The foregoing deployments occurred when Silogram was not open for business (i.e. in the early morning hours before Silogram's regular work force and Oscar Margolis arrived, late at night after Silogram's regular work force and Oscar Margolis left, as well as on Saturdays and Sundays).

90.   In connection with the foregoing scheme Defendant Stevan Jospey ordered product delivered by rail car and, when questioned by Oscar Margolis concerning certain of the purchases, Stevan Jospey claimed that he ordered the shipments because inventory needed to be replenished.

91.   During this period Defendant Stevan Jospey, in concert and cooperation with the Defendants Wilson, Romero, Quila-Moran and Lopez and Northeastern Fuel, filled the trucks with oil belonging to Silogram.

92.   Upon information and belief the Defendants, Romero and Quila-Moran, also personally profited from the foregoing scheme as evidenced by their acquisition of two new Honda Accords in 2011 which, upon information and belief, were purchased for cash using proceeds from the stolen Silogram inventory.

93.   Upon information and belief, Defendant Stevan Jospey caused Defendant Northeastern Fuel to pay Defendant Stevan Jospey (and/or to other persons or entities controlled by Defendant Stevan Jospey) for the oil belonging to Silogram.

94.   Particularly egregious purchases occurred between April 2012 and June 2012, during which period the Defendant Stevan Jospey caused Safety-Kleen Systems Inc. to deliver fuel oil to Silogram at a cost of $1,385,897.80, without paying for the product and then diverting the oil and selling it for his personal benefit.

95.   The foreseeable consequence of the foregoing diversions was the commencement of legal action by Safety-Kleen and against Silogram for the purchases, all the benefits of which

unlawfully went to Defendant Stevan Jospey and, upon information and belief, Northeastern Fuel and third parties, the identities of which are unknown at this time.

96.     The direct and foreseeable consequence of the foregoing actions was to damage Silogram's reputation in the industry, destroy its relationship with its vendors with whom Silogram conducted business for decades and to require Silogram to incur legal fees and expenses.

97.     In addition thereto, these phantom transactions increased Silogram's costs and diminished its sales, thereby further depleting the value of the Company in connection with any sale of same under the ESPA, as well as to any arms-length buyer.

98.     Silogram incurred a multi-million dollar loss, and the Defendant Jospey was unjustly enriched by the same, the full extent of which is unknown and subject to an accounting.

(iii).     **The Credit Card Fraudulent Charges Scheme**

99.     The Defendant, Stevan Jospey, maintained the use of both a business American Express card and a personal American Express card.

100.     Upon information and belief, the Defendant Stevan Jospey used those cards between 2006 and April 2013 to charge hundreds of thousands of dollars in personal expenses, as well as costs incurred in connection with the Encore enterprise.

101.     Defendant Stevan Jospey caused Silogram to pay for those charges using Silogram funds.

102.     Examples of such charges incurred by Defendant Stevan Jospey include (i) first-class airline tickets for Defendant Stevan Jospey and Brenda Guerin to Miami, FL; (ii) first-class airline tickets for Defendant Stevan Jospey and Brenda Guerin to Puerto Rico; (iii) hotel accommodations at the Borgata Hotel, Resort, and Casino in Atlantic City, NJ; (iv) hotel

accommodations at the Turnberry Isle Resort and Spa in Miami, FL; and (v) meals with his friends and family at such up-scale restaurants as Le Cirque, 151 East 58th St, New York, NY 10022.

103.    As a consequence of the foregoing from 2006 to April 2013, Jospey misappropriated at least $1 Million from Silogram, illegally diverting the proceeds to his own account and in furtherance of the illegal Encore enterprise.

(iv).    **The Truck Sale Scheme**

104.    The Defendant, Stevan Jospey, in concert and cooperation with the Defendant, Citilube, Inc., in the summer of 2012 arranged for the sale and delivery of three Silogram trucks, two of which, a 1995 Mack tractor and Trailer and a 2005 Mack tank truck were driven to Florida for purported delivery.  In addition, a 2008 Kenworth Tank Truck was sold to Gregory Bass and driven down to Florida at Silogram's expense.  Additional investigation is required to determine whether this truck was also fully loaded with product.

105.    The foregoing trucks were to have been delivered empty, without product, and the sale price for the trucks were reflective of these terms.

106.    Instead, the truck sales were ploys utilized by the Defendant Stevan Jospey, in concert and cooperation with the Defendant, Citilube, to steal Silogram additives, base oils and viscosity improvers.

107.    The foregoing scheme came to light due to the issuance of massive overweight violations as the Florida bound trucks headed south, on August 3, 2012.

108.    Following the receipt of the violations an investigation was conducted confirming evidence of the theft, including: (i) an admission by the unnamed co-conspirator, Francisco Rodriguez, that Defendant Stevan Jospey was handed a paper bag filled with cash in connection with the theft; and (ii) phony invoices from Citilube purportedly documenting purchases by

Silogram for additives and base oils from Citilube, but no meter tickets and other standard supporting documentation that would demonstrate bona fide transactions.

109.   Silogram incurred a loss of no less than $30,000.00 from the foregoing scheme and the Defendants, Stevan Jospey and Citilube were unjustly enriched by the same, the full extent of which is unknown and subject to an accounting.

### (v).   Deleted Invoices and other Cash Thefts.

110.   Upon information and belief, the Defendant Stevan Jospey, acting in concert and cooperation with co-conspirators, including the Defendants Rosalyn Jospey, Lopez, Quila-Moran and Wilson, together with other Defendants, the identities of whom are unknown at this time, effectuated the systematic theft of inventory and the proceeds of the sales of same, particularly in connection with fuel oil that Defendant Jospey ordered and diverted for that purpose.

111.   The following chart provides detail regarding the amount of gallons sold, the total gallons purchased and the missing inventory in 2010, 2011 and 2012:

| Year/Months | Total Gallons Sold | Total Gallons Purchased | Missing Inventory (Gallons) |
|---|---|---|---|
| 2010 (July to December) | 726,566 | 811,437 | -84,871 |
| 2011 (January to December) | 1,307,614 | 1,845,198 | -537,584 |
| 2012 (February – June) | 557,135 | 647,965 | -90,830 |

112.   The foregoing thefts were effectuated by cash on delivery sales and by deleting the bills of lading and other identifying documents on the computer system after the sales were complete.

113.    Silogram incurred a loss of no less than $3.5 Million from the foregoing scheme and the Defendants, Jospey, Rosalyn Jospey, Lopez, Quila-Moran and Wilson were unjustly enriched by the same, the full extent of which is unknown and subject to an accounting.

### E.  Other Acts of Looting, Waste, Mismanagement and Breach of Fiduciary Duty.

114.    In addition to the foregoing schemes, Defendant Stevan Jospey committed numerous acts of looting, waste and mismanagement to the detriment of Silogram, its shareholder and its creditors, prior to and in connection with the Encore scheme (discussed below), including: (i) engaging in numerous acts of sexual harassment and other demeaning conduct with Silogram's work force, creating thereby a hostile and oppressive workplace; (ii) causing Silogram to purchase sub-standard petroleum products, including through its transactions with Everclear, and falsely labeling same, resulting in the loss of customers and the loss of its API certification; and (iii) failing to take the remedial actions necessary to recover Silogram's API certification.

### (i)  Oppressive Workforce.

115.    The Defendant Stevan Jospey engaged in numerous acts of nepotism, sexual abuse and violent and improper conduct aimed at creating a subservient and submissive workforce that would give him free reign to plunder the company and for purposes of satisfying his sexual and mercurial appetites.

116.    Stevan Jospey caused his former wife, the Defendant Grace Jospey, to be hired in the position of office manager solely based on her relationship to Stevan Jospey and without the qualifications and experience necessary to perform, and without performing, managerial functions.

117.    Meanwhile, the Defendant Stevan Jospey and the Defendant Grace Jospey fought publicly on a daily basis until her departure from the company, resulting in a chaotic and hostile atmosphere at the workplace.

118.    In addition thereto, the Defendant, Stevan Jospey, hired his mother, the Defendant Rosalyn Jospey, in an administrative position, including as a "bookkeeper" and in connection with sales, but in reality to facilitate and cover up the acts of theft set forth above and to aid and abet the theft of Silogram's business in connection with the Encore enterprise.

119.    The Defendants acts of sexual misconduct and harassment in the workplace included: (i) entering into a relationship with Brenda Guerin, a Silogram receptionist, and conceiving two children with her during the course of his marriage with Grace Jospey; (ii) in December, 2012 engaging in sexually provocative conduct at the workplace with Phoebe Ferentz, a former Silogram employee and using the influence he had over her to induce her, together with Ferentz' friend, Antoinette Rizzica, to file a sex discrimination lawsuit against Oscar Margolis and Oscar Margolis' son, Sean Margolis, based on false and fraudulent allegations; and (iii) groping female employees, utilizing profane and inappropriate language and utilizing business functions as opportunities for attempted liaisons with female employees.

120.    Defendant Stevan Jospey further acted in a violent and derogatory manner with male employees, particularly of Hispanic origin.

121.    An example of such conduct included on one occasion taking a fire extinguisher and chasing and firing on Hispanic workers with it.

122.    When one worker caught in that incident attempted to take cover inside the Silogram truck he operated, Defendant Stevan Jospey used the extinguisher to break the side window of the Silogram truck and then continued to spray the worker through the broken window.

123.    Defendant Stevan Jospey, further, used the Silogram work force to run personal errands and perform personal services for him, including construction work at his house, all to the detriment of the company.

### (ii) Everclear.

124.   Defendant Stevan Jospey, having engaged in the wrongful acts of theft and conversion described above, thereby incurring debt on Silogram's account, while depriving Silogram of the means to repay it, began to seek products from unfamiliar sources.

125.   In connection therewith, Defendant Stevan Jospey began to order petroleum products from Everclear of Ohio, Ltd. ("Everclear") beginning in late 2010.

126.   The purchases from Everclear directed by Defendant Stevan Jospey occurred at a rate of 20,000 gallons per week between late 2010 and 2012.

127.   The product purchased and distributed under Stevan Jospey's direction to Silogram's customers was of inferior quality and resulted, beginning in November, 2011, in customer complaints that oil was disappearing from automobile engines at an alarming rate. Silogram received other customer complaints came in that oil disappeared entirely, resulting in engine failure.

128.   Thereafter, additional complaints came in that the Everclear oil delivered to Silogram's customers was contaminated with pea-sized pellets or lumps characterized as "jelly beans" and that these contaminants resulted in major incidents of engine failure.

129.   The foregoing purchases and sales under Stevan Jospey's direction, and instigated by him as a collateral consequence of his acts of theft, resulted in the loss of major customers and caused irreparable harm to the reputation Silogram earned during the course of its 100 year history.

### (iii) The Loss of Silogram's API License.

130.   Notwithstanding the tainted nature of the Everclear product, Defendant Stevan Jospey caused Silogram to label its products as uniformly in compliance with the American Petroleum Institute's (the "API") performance standards.

131.   Numerous customer complaints to the API ensued resulting in a Consumer Alert concerning Silogram's products and an audit concerning the same.

132.   In responding to the API, Defendant Stevan Jospey, purporting to be acting on behalf of Silogram, falsely stated in writing that Silogram produced "Tier 1" licensed products and "Tier 2" unlicensed products and that the defective product was accidently mislabeled as Tier 1, when Silogram intended to sell it as a Tier 2 unlicensed product.

133.   In reality, the mislabeling of the product was the consequence of Defendant Stevan Jospey's waste, mismanagement, self-dealing and total indifference to the consequences to Silogram and its reputation caused by the sale of defective and mislabeled lubricants.

134.   Despite the performance failures that resulted from the distribution of Everclear based lubricants, the API provided Silogram with the opportunity to come into compliance, outlining various steps including: (i) ceasing to make performance claims without substantiated outcomes; (ii) recalling all product of purported "Tier 2" product bearing labels that falsely assert that API specifications had been met; (iii) providing proof that the recall had been completed; and (iv) describing in detail the purported step by step process Stevan Jospey claimed he implemented to remove labels on "Tier 2" product bearing API markings.

135.   Defendant Stevan Jospey neither implemented, nor fulfilled the requirements of the API and continued to make misrepresentations about the product he caused Silogram to place on the market.

136.   As a consequence of the foregoing, on December 21, 2012, the API terminated Silogram's API license.

## F. **The Encore Scheme.**

137.   In late 2011, early 2012, Oscar Margolis became suspicious concerning Silogram's finances, including the fact that its purchases were increasing, at Defendant Stevan Jospey's direction, but it was not appearing to be making any money.

138.   As a consequence of these suspicions, his loss of control over the company and infirmities caused by age and ill health, in March 2012, Oscar Margolis asked his son, Sean Margolis, to act as his deputy at Silogram and to investigate.

139.   Following Sean Margolis' arrival, Defendant Stevan Jospey attempted to keep his acts of misfeasance and malfeasance hidden, with decreasing success.

140.   Meanwhile, Defendant Stevan Jospey was aware of the full extent of his theft and the irreparable harm he had inflicted on Silogram, its creditors and its shareholder.

141.   As a consequence of the foregoing factors, Defendant Stevan Jospey acting in concert and cooperation with the co-defendants, devised a scheme aimed at misappropriating Silogram's remaining business and forcing Silogram to cease its operations.

142.   In furtherance of the foregoing scheme, Defendant Stevan Jospey engaged Defendant Luis Lebron to act as his nominee for purposes of forming and taking nominal ownership in Defendant Encore.

143.   Upon information and belief, Defendant Stevan Jospey, from Encore's inception, controlled Encore, made all decisions concerning its operations and activities and dominated and controlled the business, such that it was at all times his alter ego.

144.   Defendant Stevan Jospey gave nominal title in Encore to Lebron in order to camouflage Stevan Jospey's domination of the company and the illegal enterprise to which it was deployed.

25

145.  In connection therewith, Defendant Stevan Jospey hired Defendant Lebron in or about November, 2011 in the position of Silogram's sales director, where he remained until Lebron's termination from Silogram in November, 2012.

146.  Defendant Lebron had no prior experience in the petroleum industry when he was hired by Stevan Jospey.

147.  Defendant Lebron executed Silogram's standard Sales Agreement in connection with his hire which, inter alia:

- Obligated the employee to devote his efforts exclusively to Silogram;

- Acknowledged that Silogram's confidential information and trade secrets, including without limitation financial information, supply and service information, marketing information, personal information, customer information and methods of business operation constituted Silogram's exclusive property and that the unauthorized disclosure of same would result in irreparable harm to the Plaintiff;

- Prevented the employee from competing with Silogram during the course of his employment or within two years thereafter.

148.  In patent violation of the foregoing provisions, Defendant Lebron, acting in concert and cooperation with Defendant Stevan Jospey, left his employment at Silogram in or about November 2012 and formed Defendant Encore as its purported sole member.

149.  Defendants Stevan Jospey and Lebron then began to represent to potential customers, including customers of Plaintiff, that Defendant Encore was affiliated with and/or is the successor of Plaintiff.

150.  The LinkedIn page for Defendant Encore associated Encore and Silogram, stating that "so confident are we of our TOTAL SERVICE PROGRAM, Encore challenges any lubricant supplier to surpass it.  The conscientious effort that every SILOGRAM field engineer extends to their customers is unsurpassed too."

151.   Defendant Stevan Jospey, while this was taking place, was actively engaged in sabotaging Silogram's business pending his departure, with the objective of destroying it and taking Silogram's customers, confidential information and trade secrets and good will.

152.   While still in the employ of Silogram Defendant Stevan Jospey, in concert and cooperation with Defendant Lebron, had Encore undercut Silogram's pricing by selling product at below market prices and soliciting Silogram's customers at those price points.

153.   When the foregoing was brought to Defendant Stevan Jospey's attention, he simply directed the remaining sales force at Silogram to match the prices, notwithstanding that: (i) Stevan Jospey through his control of Encore controlled the prices for the product that Encore was selling; and (ii) upon information and belief, the price structure was reinforced by the availability of petroleum products that had been stolen by Defendant Stevan Jospey, in concert and cooperation with Defendant Northeastern, and diverted to or for the benefit of Encore with the goal of making Silogram incur heavy losses.

154.   At or about the time of the formation of Encore, and continuing thereafter and following Defendant Stevan Jospey's departure from Silogram, Defendant Stevan Jospey, aided and abetted by his nominee, Lebron, solicited Silogram's workforce (with the exception of Oscar Margolis), outside of the purview of Sean Margolis for purposes of convincing or compelling their departure from Silogram and to induce them to accept alternative employment with Encore.

155.   Those employees of Silogram that refused or resisted leaving Silogram and accepting employment at Encore were subjected to threats and coercion.

156.   In connection therewith the following employees were met with curses when entering Silogram's facility, chased when driving to and from work and otherwise accosted for

27

remaining in Silogram's employ: (a) David Spiegel; (b) Michael Mattera; (c) Debbie Colucci; (d) Cathy Lee; and (e) Cindy Giamio.

157.   In addition thereto, Ginger Berens, a former Silogram sales representative based in Colorado, reported receiving blocked calls threatening her safety and that of Silogram's employees before leaving to work for Encore.

158.   The foregoing acts were in direct violation of the terms and conditions of the Defendants Stevan Jospey's and Lebron's employment agreements, and the threats and coercion exercised and/or directed by them were criminal in nature.

159.   As a consequence of the foregoing acts the following Defendants, former Silogram employees were induced to leave Silogram and work for the Defendant, Encore in direct competition with the Plaintiff, Silogram: (i) Defendant, Roslyn Jospey; (ii) Defendant, Morris Wilson; (iii) Defendant, Carlos Romero; (iv) Defendant, Gary Moran; (v) Defendant, William Bryant III; (vi) Defendant, Phoebe Ferentz; (vii) Defendant, Antoinette Rizzica; (viii) Defendant, Alison Savo; (ix) Defendant, Juan Quila Moran; (x) Defendant, Hermino Lopez; and (xi) Defendant, Grace Jospey.

160.   The Former Employee Defendants executed Silogram's standard Sales and/or Employment Agreement in connection with which each, inter alia:

- agreed to devote his/her efforts exclusively to Silogram;

- Acknowledged that Silogram's confidential information and trade secrets, including without limitation financial information, supply and service information, marketing information, personal information, customer information and methods of business operation constituted Silogram's exclusive property and that the unauthorized disclosure of same would result in irreparable harm to the Plaintiff; and

- Agreed not to compete with Silogram during the course of his/her employment or within two years thereafter.

28

161.    The Former Employee Defendants violated the terms of their employment agreements by virtue of accepting employment at Encore, competing with Silogram and by facilitating the wrongful acts committed by Defendants, Stevan Jospey and Lebron.

162.    The establishment of Encore for the intended purpose of directly competing with Silogram, stealing its customers, impugning its reputation in the industry and destroying its business resulted in the direct loss of revenues from the commencement of Encore's business in or about November/December 2012.

163.    Thereafter, the Defendant Stevan Jospey left Silogram, joined by his mother, the Defendant Roslyn Jospey, and other Former Employee Defendants in or about April 2013 and under the guise of accepting employment at Encore, took over the day to day operations of that company.

164.    In connection therewith, and in furtherance of his scheme to destroy Silogram and convert its customers and goodwill, Defendant Stevan Jospey, aided and abetted by the Defendant, Roslyn Jospey, and other former Employee Defendants and John and Jane Doe Defendants, the identities of which are not yet known, but subject to disclosure, engaged in the theft of Silogram books, records, customer lists and Silogram's Dell Vostro Mini-Tower computer.

165.    The stolen property was deployed by Defendant Stevan Jospey, his nominee, Defendant Lebron, and Defendant Encore, aided and abetted by the Former Employee Defendants, to unfairly compete with Silogram.

166.    As a consequence of the foregoing theft, Encore obtained direct access to Silogram's customer lists, customer history, routes and methods of operation, pricing information and all other information necessary to the normal operation of Silogram's business, while depriving Silogram of the same.

167.    The stolen property further included executed employment agreements which were taken by the Defendants Stevan Jospey and Roslyn Jospey in furtherance of the Encore scheme and in order to cover up the fact that the actions taken by them and the other former employee Defendants were in violation of the employment agreements.

168.    The stolen property, including the Dell computer and the operation of "log me in" software on same, was employed by Defendants to, *inter alia*, track customer orders from Silogram, intercepting those orders and filling them as counterfeit Silogram deliveries.

169.    The Plaintiff was alerted to these activities from a long term customer, Canete Landscaping, when it received a delivery of motor oil at the unusual time of 7:00 p.m. and provided a check payable to Silogram.

170.    Canete was then asked to issue a new check payable to Encore (purportedly as Silogram's "successor").

171.    Based on the foregoing unusual occurrence, Canete contacted Silogram and described the foregoing occurrence.

172.    The theft of the Dell computer was thereafter uncovered by tracking Silogram's "log me in" software attached to same, as a result of which the Plaintiff was able to alert law enforcement, who, upon information and belief, obtained a warrant to search Encore's facilities and executed on same.

173.    Upon information and belief, as a consequence of the search, the property stolen from Silogram and other books and records evidencing the foregoing fraudulent scheme were confiscated and remain in the possession and control of law enforcement.

174. Upon information and belief, a criminal investigation into Defendants Jospey, Lebron, Encore and various Former Employee Defendants regarding the allegations contained herein, as well as other criminal activity, is ongoing.

175. Notwithstanding the discovery of the Defendants' overt and covert illegal activities and the ongoing investigation by law enforcement, Defendant Stevan Jospey, aided and abetted by the Former Employee Defendants, continued to utilize Encore as an illegal enterprise for purposes of unfairly competing with Silogram.

176. The activities described above resulted in the outcome intended by Defendant Stevan Jospey, the loss of Silogram's customers, numerous claims by creditors as a result of his theft of inventory, acts of waste and looting and intended and unintended acts of mismanagement.

177. As a consequence of the foregoing, Silogram's revenues precipitously declined, as illustrated by the following chart:

|  | **2012** | **2013** |
|---|---|---|
| **January** | 1,509,547.75 | 1,140,083.34 |
| **February** | 1,400,383.15 | 937,486.66 |
| **March** | 1,456,193.50 | 779,562.67 |
| **April** | 1,125,848.88 | 850,040.60 |
| **May** | 1,276,908.36 | 471,844.36 |
| **June** | 1,038,863.50 | N/A |

| July | 1,229,885.68 | N/A |
|---|---|---|
| August | 1,367,284.98 | N/A |
| September | 1,135,351.11 | N/A |
| October | 1,099,637.32 | N/A |
| November | 1,088,311.48 | N/A |
| December | 915,425.23 | N/A |

178.   As a consequence of the foregoing acts the Plaintiff was rendered insolvent and its business was destroyed.

## FIRST CAUSE OF ACTION
### (Trademark/Tradename Infringement under Lanham Act 15 U.S.C. § 1114 – Encore)

179.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-178, as if set forth again in full.

180.   Defendant Encore has used and, upon information and belief, continues to use in commerce the term SILOGRAM as a trademark for sales of fuel, oil, lubricants and related products in such a way as has and will likely cause confusion or mistake, or has deceived or will likely deceive the public in relation to their products being associated or identified or being the same as those of Plaintiff.

181.   Plaintiff never consented to or authorized Defendant Encore's adoption or commercial use of the SILOGRAM trademarks for sale of their aforementioned products.

32

182.   At all times relevant, Defendant Encore knew of the prior adoption and widespread commercial use of the SILOGRAM marks that Plaintiff currently owns and knew of the goodwill and reputation acquired by Plaintiff in connection with the SILOGRAM trademark, and products.

183.   Defendant Encore's infringement on Plaintiff's trademarks is therefore willful and deliberate.

184.   Defendant's use of the Silogram® to promote, market or sell products and services including those products and services offered by Silogram, constitutes trademark infringement pursuant to 15 U.S.C. § 1114.

185.   Plaintiff has no control and never had any control over the composition and quality of Defendant Encore's infringing products.

186.   Defendant's intentional and willful infringement of the Silogram® registered trademark and Plaintiff's goodwill has caused and will continue to cause irreparable damage to Silogram for which there is no adequate remedy at law.

187.   By reason of the foregoing, Plaintiff has been injured in an amount not yet ascertained.

188.   Defendant Encore is therefore directly liable for these actions.

### SECOND CAUSE OF ACTION
**(Unfair Competition; False Designation of Origin under Lanham Act 15 U.S.C. § 1125(a) – Encore)**

189.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-188, as if set forth again in full.

190.   The SILOGRAM trademark has become uniquely associated with, and here identifies, Plaintiff.

191. Defendant Encore's use of SILOGRAM trademark constitutes a false designation of origin, and/or a false representation.

192. Further, it wrongfully and falsely designates Defendant Encore's products as originating from or connected with Plaintiff and constitutes utilizing false descriptions or representations in interstate commerce.

193. Defendant's use of the Silogram® mark to promote, market, or sell their products and/or services in direct competition with Silogram constitutes Unfair Competition pursuant to 15 U.S.C. § 1125(a).

194. Defendant's use of the Silogram® mark is likely to cause confusion, mistake, and deception among consumers, who have been and will be wrongfully led to believe that Defendant Encore is associated with Plaintiff, and thereby depriving Plaintiff of its valid trademark rights.

195. Defendant Encore, in adopting the SILOGRAM trademarks, has acted willfully and with full knowledge of Plaintiff's rights therein.

196. Defendant's unfair competition has caused and will continue to cause irreparable damage to Silogram for which there is no adequate remedy at law.

197. By reason of the foregoing, Plaintiff has been injured in an amount not yet ascertained.

198. Defendant Encore is therefore directly liable for these actions.

### THIRD CAUSE OF ACTION
**(Misappropriation of Trade Secrets – Stevan Jospey, Rosalyn Jospey, Luis Lebron Encore)**

199. Plaintiff incorporates by reference each of the foregoing paragraphs 1-198, as if set forth again in full.

200.   At all relevant times, Plaintiff maintained proprietary customer information, including customer lists, contact information and sales history, and proprietary formulas for the blending of lubricants and related products (collective, the "Trade Secret Information").

201.   Plaintiff derives independent economic value from the Trade Secret Information, which provides Plaintiff with an opportunity to obtain an advantage over competitors.

202.   Plaintiff developed the Trade Secret Information at great expense and over a long period of time.

203.   The Trade Secret Information is not generally known or readily ascertainable by proper means by persons outside of Plaintiff's business.

204.   The Trade Secret Information is the subject of Plaintiff's reasonable efforts to maintain its secrecy.

205.   Plaintiff's Trade Secret Information described herein is not and was not generally known to Plaintiff's competitors in the industry.

206.   Plaintiff's Trade Secret Information described herein is not and was not generally known to or readily ascertainable by Plaintiff's employees and others involved in Plaintiff's business.

207.   Availability of the Trade Secret Information to a competitor provides a significant competitive advantage and causes a loss to Plaintiff. Defendant Encore misappropriated Plaintiff's Trade Secret Information by acquiring knowledge of those trade secrets through the misappropriation of same by Defendants Stevan Jospey, Rosalyn Jospey and Lebron, when it knew or should have known that such Trade Secret Information had been acquired by Defendants Stevan Jospey, Rosalyn Jospey and Lebron by improper means, and/or acquired by Stevan Jospey,

Rosalyn Jospey and Lebron under circumstances giving rise to a duty to maintain their secrecy or limit its use.

208.   By reason of the foregoing acts of Defendants Encore, Stevan Jospey, Rosalyn Jospey and Lebron, Plaintiff has suffered irreparable damage for which it has no adequate remedy at law.

209.   Plaintiff is therefore entitled to recover from Defendants Encore, Stevan Jospey, Rosalyn Jospey and Lebron the damages is has sustained as a result of their wrongful act as hereinabove alleged.  The amount of damages cannot be determined at this time and is subject to an accounting.

210.   Defendants Encore, Stevan Jospey, Rosalyn Jospey and Lebron's acts of misappropriation were both wilful and deliberate, and therefore Plaintiff is entitled to an award of exemplary damages and attorney fees.

211.   Plaintiff is further entitled to recover against Defendants Encore, Stevan Jospey, Rosalyn Jospey and Lebron, the gains, profits, advantages and unjust enrichment they have obtained as a result of their wrongful acts, subject to an accounting.

### FOURTH CAUSE OF ACTION
### (Unfair Competition Under New York Common Law – Encore)

212.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-211, as if set forth again in full.

213.   Defendant Encore misappropriated Silogram's commercial advantage by using its skill, expenditures and labor to its own commercial advantage to promote, market, or sell Defendant Encore's products in direct competition with Silogram.

214.   In doing so, Defendant Encore acted knowingly, wantonly, in bad faith and with intentional disregard for the rights of Silogram.

36

215.    The foregoing acts of Defendant Encore were done without justification and for the wrongful purpose of injuring Silogram and its competitive position while unfairly benefiting Defendant Encore.

216.    Defendant Encore's unlawful competition has caused and will cause loss, injury and damage to Silogram.

217.    The amount of damages cannot be determined at this time and is subject to an accounting.

218.    Defendant Encore's acts hereinabove described were both wilful and deliberate, and therefore Plaintiff is entitled to an award of exemplary damages and attorney fees.

## FIFTH CAUSE OF ACTION
### (Trademark/Tradename Infringement under N.Y. Gen. Bus. § 360-k – Encore)

219.    Plaintiff incorporates by reference each of the foregoing paragraphs 1-218, as if set forth again in full.

220.    Defendant Encore's use of the Silogram®, without Plaintiff's consent, in connection with the sale, distribution, offering for sale, or advertising of Defendant Encore's goods and/or services constitutes trademark infringement.

221.    Defendant Encore's use of the Silogram® is likely to cause confusion or mistake or to deceive as to the source of origin of such goods.

222.    Defendant Encore's intentional and willful infringement of the Silogram® registered trademark has caused and will continue to cause damage to Silogram, and is causing irreparable harm to Silogram for which there is no adequate remedy at law.

223.    Defendant Encore is therefore directly liable for these actions.

224.    The amount of damages cannot be determined at this time and is subject to an accounting.

225.   Defendant Encore's acts hereinabove described were both wilful and deliberate, and therefore Plaintiff is entitled to an award of exemplary damages and attorney fees.

## SIXTH CAUSE OF ACTION
### (Unfair and Deceptive Business Practice under N.Y. GEN. BUS. LAW § 349 – Encore)

226.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-225, as if set forth again in full.

227.   Defendant Encore's use of Silogram® to promote, market, or sell products or services constitutes a deceptive act or practice in the conduct of Defendant Encore's business, trade or commerce, and in the furnishing of services to consumers and therefore a violation of N.Y. Gen. Bus. Law § 349 *et seq.*

228.   Defendant Encore's materially misleading practice of directly telling or leading customers to believe they are acting on behalf of Silogram is likely to cause the consuming public at large to be misled as to the true source, sponsorship, or affiliation of the products furnished or the services rendered.

229.   As a result of Defendant Encore's actions, Silogram has been damaged in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### (False Advertising under N.Y. Gen. Bus. L. § 350 – Encore)

230.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-229, as if set forth again in full.

231.   Defendant Encore has engaged and continues to engage in consumer-oriented conduct which is deceptive or misleading in a material way, constituting false advertising in the conduct of a business, trade or commerce, in violation of § 350 of the N.Y. General Business Law.

232.   As a result of Defendant Encore's false advertising, Plaintiff has suffered and will continue to suffer substantial injury, including irreparable injury and damages, included but not limited to loss of sales and profits that Plaintiff would have made but for the false and deceptive advertising by Defendant Encore, unless Defendant Encore is preliminarily and/or permanently enjoined by this Court.

## EIGHTH CAUSE OF ACTION
### (Breach of Contract – Stevan Jospey)

233.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-232, as if set forth again in full.

234.   Jospey entered into the ESPA with Silogram, dated July 1, 2009.

235.   Jospey's employment with Encore violates the non-compete provisions of the ESPA and constitutes a breach thereof.

236.   Plaintiff has been damaged as a result of Jospey's breach of contract.

237.   As a result of that breach, Plaintiff suffered damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### (Breach of Contract – Luis Lebron)

238.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-237, as if set forth again in full.

239.   Lebron entered an employment agreement with Silogram.

240.   Lebron's employment with Encore violates the non-compete clause in his employment agreement with Silogram and constitutes a breach of contract.

241.   Plaintiff has been damaged as a result of Lebron's breach of contract.

242.   As a result of that breach, Plaintiff suffered damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION
### (Breach of Contract – William Bryant III)

243.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-242, as if set forth again in full.

244.   Bryant entered an employment agreement with Silogram, dated December 11, 2012.

245.   Bryant's employment with Encore violates the non-compete clause in his employment agreement with Silogram and constitutes a breach of contract.

246.   Plaintiff has been damaged as a result of Bryant's breach of contract.

247.   As a result of that breach, Plaintiff suffered damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
### (Breach of Contract – Phoebe Ferentz)

248.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-247, as if set forth again in full.

249.   Ferentz entered an employment agreement with Silogram, dated December 11, 2012.

250.   Ferentz's employment with Encore violates the non-compete clause in his employment agreement with Silogram and constitutes a breach of contract.

251.   Plaintiff has been damaged as a result of Ferentz's breach of contract.

252.   As a result of that breach, Plaintiff suffered damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
### (Breach of Contract – Antoinette Rizzica)

253.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-252, as if set forth again in full.

254.   Rizzica entered an employment agreement with Silogram, dated December 11, 2012.

255.   Rizzica's employment with Encore violates the non-compete clause in his employment agreement with Silogram and constitutes a breach of contract.

256.   Plaintiff has been damaged as a result of Rizzica's breach of contract.

257.   As a result of that breach, Plaintiff suffered damages in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION
### (Breach of Contract – Alison Savo)

258.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-257, as if set forth again in full.

259.   Savo entered an employment agreement with Silogram, dated July 22, 2010.

260.   Savo's employment with Encore violates the non-compete clause in his employment agreement with Silogram and constitutes a breach of contract.

261.   Plaintiff has been damaged as a result of Savo's breach of contract.

262.   As a result of that breach, Plaintiff suffered damages in an amount to be determined at trial.

## FOURTEENTH CAUSE OF ACTION
### (Breach of Contract – Gary Moran)

263.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-262, as if set forth again in full.

264.   Moran entered an employment agreement with Silogram.

265.   Moran's employment with Encore violates the non-compete clause in his employment agreement with Silogram and constitutes a breach of contract.

266.   Plaintiff has been damaged as a result of Moran's breach of contract.

267.   As a result of that breach, Plaintiff suffered damages in an amount to be determined at trial.

### FIFTEENTH CAUSE OF ACTION
**(Breach of Contract – Ginger Berens)**

268.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-267, as if set forth again in full.

269.   Berens entered an employment agreement with Silogram, dated September 15, 2008.

270.   Berens' employment with Encore violates the non-compete clause in his employment agreement with Silogram and constitutes a breach of contract.

271.   Plaintiff has been damaged as a result of Berens' breach of contract.

272.   As a result of that breach, Plaintiff suffered damages in an amount to be determined at trial.

### SIXTEENTH CAUSE OF ACTION
**(Breach of Contract – Rosalyn Jospey)**

273.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-272, as if set forth again in full.

274.   Rosalyn Jospey entered an employment agreement with Silogram.

275.   Rosalyn Jospey's employment with Encore violates the non-compete clause in his employment agreement with Silogram and constitutes a breach of contract.

276.   Plaintiff has been damaged as a result of Rosalyn Jospey's breach of contract.

277.   As a result of that breach, Plaintiff suffered damages in an amount to be determined at trial.

## SEVENTEENTH CAUSE OF ACTION
### (Breach of Contract – Grace Jospey)

278.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-277, as if set forth again in full.

279.   Grace Jospey entered an employment agreement with Silogram, dated July 27, 2010.

280.   Grace Jospey's employment with Encore violates the non-compete clause in his employment agreement with Silogram and constitutes a breach of contract.

281.   Plaintiff has been damaged as a result of Grace Jospey's breach of contract.

282.   As a result of that breach, Plaintiff suffered damages in an amount to be determined at trial.

## EIGHTEENTH CAUSE OF ACTION
### (Tortious Interference with Business Relations – Encore, Stevan Jospey and Lebron)

283.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-282, as if set forth again in full.

284.   In the ordinary course of Plaintiff's business, Plaintiff had business relationships with its various customers.

285.   Defendants Encore, Stevan Jospey and Lebron were fully aware that Plaintiff had these business relationships which have historically been and were likely to result in economically advantageous relationships between Plaintiff and its customers.

286.   Defendants Encore, Stevan Jospey and Lebron interfered with those business relationships by (i) intentionally misleading Plaintiff's customers into believing that Encore was affiliated with or was the successor to Plaintiff; (ii) making false statements to Plaintiff's customers that Plaintiff had filed for bankruptcy relief and/or was otherwise out of business and

43

was, therefore, incapable of filling their orders; and (iii) otherwise disparaging Plaintiff, its product and its sole shareholder, Oscar Margolis.

287.    In so acting, the defendants acted for a wrongful purpose and/or used dishonest, unfair or improper means.

288.    As a result of Defendants' interference, Plaintiffs have been damages in an amount to be determined at trial.

289.    The Defendants Encore, Stevan Jospey and Lebron's conduct, as alleged herein, was purposeful and intentional and was engaged in for the purpose of depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to cruel and unjust hardship in conscious disregard of its rights, and was performed with fraud, oppression or malice so as to justify an award of exemplary or punitive damages against such Defendants in an amount according to proof at trial.

## NINETEENTH CAUSE OF ACTION
### (Conversion – Stevan Jospey and Rosalyn Jospey)

290.    Plaintiff incorporates by reference each of the foregoing paragraphs 1-289, as if set forth again in full.

291.    At all relevant times, Plaintiff was, and still is, the owner of and entitled to possession of its customer lists and other Trade Secret Information, its books, records, and other documents and agreements, and its office equipment, including computers (collectively, the "Misappropriated Office Materials").

292.    At all relevant times, Plaintiff was the owner of the Misappropriated Office Materials.

293.     As discussed herein, Defendants Stevan Jospey and Rosalyn Jospey engaged in the theft of the Misappropriated Office Materials from Plaintiff's possession, without Plaintiff's knowledge or permission, and converted the same for their own use.

294.     As a proximate result of Defendants Stevan Jospey and Rosalyn Jospey's conversion of Plaintiff's property, Defendants Stevan Jospey and Rosalyn Jospey have caused Plaintiff to suffer damages in an amount to be proven at trial.

295.     Each of the aforementioned acts of conversion was done willfully and maliciously, with the deliberate intent to injury Plaintiff's business, thereby entitling Plaintiff to exemplary damages and/or attorneys' fees to be proven at trial.

### TWENTIETH CAUSE OF ACTION
#### (Conversion – Stevan Jospey and Advantage Environmental)

296.     Plaintiff incorporates by reference each of the foregoing paragraphs 1-295, as if set forth again in full.

297.     At all relevant times, Plaintiff was, and still is, the owner of and entitled to possession of its Waste Disposal Rebates.

298.     As discussed herein, Defendants Stevan Jospey and Advantage Environmental conspired to deprive Plaintiff of the value of its Waste Disposal Rebates, without Plaintiff's knowledge or permission, and converted the same for their own use.

299.     As a proximate result of Defendants Stevan Jospey and Advantage Environmental's conversion of Plaintiff's property, Defendants Stevan Jospey and Advantage Environmental have caused Plaintiff to suffer damages in an amount to be proven at trial.

300.     Each of the aforementioned acts of conversion was done willfully and maliciously, with the deliberate intent to injury Plaintiff's business, thereby entitling Plaintiff to exemplary damages and/or attorneys' fees to be proven at trial.

## TWENTY-FIRST CAUSE OF ACTION
### (Conversion – Stevan Jospey, Northeastern, D'Auria, Wilson, Romero, Quila-Moran and Lopez)

301.    Plaintiff incorporates by reference each of the foregoing paragraphs 1-300, as if set forth again in full.

302.    At all relevant times, Plaintiff was the owner of and entitled to possession of its fuel, oil and other inventory (collectively, the "Inventory").

303.    As discussed herein, Defendants Stevan Jospey, Northeastern, D'Auria, Wilson, Romero, Quila-Moran and Lopez (collectively, the "Inventory Theft Defendants") conspired to steal the Inventory from Plaintiff's possession, without Plaintiff's knowledge or permission, and converted the same for their own use.

304.    As a proximate result of the Inventory Defendants' conversion of Plaintiff's Inventory, the Inventory Defendants have caused Plaintiff to suffer damages in an amount to be proven at trial.

305.    Each of the aforementioned acts of conversion was done willfully and maliciously, with the deliberate intent to injury Plaintiff's business, thereby entitling Plaintiff to exemplary damages and/or attorneys' fees to be proven at trial.

## TWENTY-SECOND CAUSE OF ACTION
### (Conversion – Stevan Jospey, Citilube and Bass)

306.    Plaintiff incorporates by reference each of the foregoing paragraphs 1-305, as if set forth again in full.

307.    At all relevant times, Plaintiff was, and still is, the owner of and entitled to possession of its Inventory, and was, and still is, entitled to the proceeds from the sale of same.

308.    As discussed herein, using the authorized and approved sale of certain of Plaintiff's vehicles to Citilube, Defendants Stevan Jospey, Citilube and Bass conspired to steal Inventory

from Plaintiff's possession, without Plaintiff's knowledge or permission, and converted such Inventory for their own use, by arranging for the vehicles to be sold to Citilube to be filled with Inventory.

309.    As a proximate result of Defendants Stevan Jospey, Citilube and Bass's conversion of Plaintiff's property, such Defendants have caused Plaintiff to suffer damages in an amount to be proven at trial.

310.    Each of the acts of conversion was done willfully and maliciously, with the deliberate intent to injury Plaintiff's business, thereby entitling Plaintiff to exemplary damages and/or attorneys' fees to be proven at trial.

### TWENTY-THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty (Corporate Waste and Mismanagement) – Stevan Jospey)

311.    Plaintiff incorporates by reference each of the foregoing paragraphs 1-310, as if set forth again in full.

312.    As Plaintiff's Operation Manager, Defendant Stevan Jospey owed the highest obligation of good faith, fair dealing, loyalty, and due care to Plaintiff, including a legal and fiduciary duty to avoid wasting the assets of Plaintiff.

313.    As Plaintiff's Vice President, Defendant Stevan Jospey owed the highest obligation of good faith, fair dealing, loyalty, and due care to Plaintiff, including a legal and fiduciary duty to avoid wasting the assets of Plaintiff.

314.    Defendant Stevan Jospey wasted Plaintiff's assets by, among other things, improperly engaging in, authorizing, acquiescing in or otherwise failing to supervise and prevent the improper wasting of millions of dollars of Plaintiff's assets, including, but not limited to the stolen rebate scheme, as set forth in detail above in Paragraphs 75 through 87, the off-hours oil

theft scheme, as set forth in detail above in Paragraphs 88 through 98, the credit card fraudulent

charges scheme, as set forth in detail above in Paragraphs 99 through 103, the truck sale scheme,

as set forth in detail above in Paragraphs 104 through 109, creating an oppressive work

environment as set forth in detail above in Paragraphs 115 through 123, causing the loss of

Plaintiff's API License as set forth in detail above in Paragraphs 130 through 136, and the Encore

scheme, as set forth in detail above in Paragraphs 137 through 178.

315.   Each of the aforementioned acts, omissions and transactions was made for

Defendant Stevan Jospey's own self-interested purposes and caused Plaintiff to sustain significant

damages.

316.   Defendant Stevan Jospey acted in a willful manner and could not have undertaken

the aforementioned acts, omissions and transactions in good faith or in the exercise of prudent

business judgment to protect and promote Plaintiff's corporate interests.

317.   As a direct and proximate consequence of the foregoing, Plaintiff has been damaged

in an amount to be determined at trial.

318.   Plaintiff has no adequate remedy at law.

### TWENTY-FOURTH CAUSE OF ACTION
**(Breach of Fiduciary Duty (self-dealing transactions) – Stevan Jospey)**

319.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-318, as if set

forth again in full.

320.   As Plaintiff's Operation Manager, Defendant Stevan Jospey owed the highest

obligation of good faith, fair dealing, loyalty, and due care to Plaintiff, including a legal and

fiduciary duty to avoid acting in his own interests contrary to the best interests of Plaintiff.

321.    As Plaintiff's Vice President, Defendant Stevan Jospey owed the highest obligation of good faith, fair dealing, loyalty, and due care to Plaintiff, including a legal and fiduciary duty to avoid wasting the assets of Plaintiff.

322.    Defendant Stevan Jospey breached his fiduciary duty to Plaintiff by, among other things, improperly engaging in, authorizing, acquiescing in or otherwise failing to supervise and prevent the improper wasting of millions of dollars of Plaintiff's assets, including, but not limited to the stolen rebate scheme, as set forth in detail above in Paragraphs 75 through 87, the off-hours oil theft scheme, as set forth in detail above in Paragraphs 88 through 98, the credit card fraudulent charges scheme, as set forth in detail above in Paragraphs 99 through 103, the truck sale scheme, as set forth in detail above in Paragraphs 104 through 109, and the Encore scheme, as set forth in detail above in Paragraphs 137 through 178.

323.    Each of the aforementioned acts, omissions and transactions was made for Defendant Stevan Jospey's own self-interested purposes and caused Plaintiff to sustain significant damages.

324.    Defendant Stevan Jospey acted in a willful manner and could not have undertaken the aforementioned acts, omissions and transactions in good faith or in the exercise of prudent business judgment to protect and promote Plaintiff's corporate interests.

325.    As a direct and proximate consequence of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

326.    Plaintiff has no adequate remedy at law.

## TWENTY-FIFTH CAUSE OF ACTION
### (Accounting – Stevan Jospey)

327.    Plaintiff incorporates by reference each of the foregoing paragraphs 1-326, as if set forth again in full.

328.    As alleged herein, Defendant Stevan Jospey owed a fiduciary duty to Plaintiff to, among other things, refrain from unduly benefiting himself and his related entities at the expense of Plaintiff.

329.    As alleged herein, Defendant Stevan Jospey breached his fiduciary duty to Plaintiff by, among other things, engaging in, authorizing, acquiescing or otherwise failing to prevent the conversion of corporate assets, self-dealing, waste, mismanagement, and fraud.

330.    Defendant Stevan Jospey, at all relevant times, possessed complete control over the books and records of Plaintiff concerning the details of his corporate wrongdoing.

331.    Defendant Stevan Jospey, at all relevant times, altered, or caused to be altered, the books of records of Plaintiff, in an effort to hide his corporate wrongdoing.

332.    As a result of Defendant Stevan Jospey's misconduct, Plaintiff suffered damages and is entitled to recovery.

333.    Plaintiff demands Defendant Stevan Jospey supply an accounting of all transfers of Plaintiff assets, including accounts receivable, made to or for the benefit of Defendant Stevan Jospey.

## TWENTY-SIXTH CAUSE OF ACTION
### (Faithless Servant – Stevan Jospey and all Former Employee Defendants)

334.    Plaintiff incorporates by reference each of the foregoing paragraphs 1-333, as if set forth again in full.

335.    In the course of their employment with Plaintiff, Defendant Stevan Jospey and each of the Former Employee Defendants breached their duties to Plaintiff, assisted other employees in breaching their duties to Plaintiff, converted Plaintiff's assets, engaged in self-dealing, and waste and mismanagement.

336.    The disloyalty of Defendant Stevan Jospey and each of the Former Employee Defendants permeated their service to Plaintiff in its most material and substantial part.

337.    Defendant Stevan Jospey and each of the Former Employee Defendants must repay all compensation they received whether in the form of salary, bonus, or other payments.

## TWENTY-SEVENTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty – Encore, Lebron, Romero, Moran, Lopez, Bass, Northeastern, D'Auria, Citilube, Advantage Environmental and Rosalyn Jospey)

338.    Plaintiff incorporates by reference each of the foregoing paragraphs 1-337, as if set forth again in full.

339.    As employees for Plaintiff, Defendants Lebron, Romero, Moran, Lopez, and Rosalyn Jospey were intimately aware of the relationship between Defendant Stevan Jospey and Plaintiff, and the fiduciary duty Defendant Stevan Jospey owed Plaintiff.

340.    As business competitors and/or business counterparts of Silogram, and due to the relationships forged between Stevan Jospey, on the one hand, and Encore, Bass, Northeastern, D'Auria, Citilube and Advantage Environmental, on the other hand, Defendants Encore, Bass, Northeastern, D'Auria, Citilube and Advantage Environmental were intimately aware of the

51

relationship between Defendant Stevan Jospey and Plaintiff, and the fiduciary duty Defendant

Stevan Jospey owed Plaintiff.

341.    Each of the aforementioned Defendants was intimately aware of the facts

underlying Defendant Stevan Jospey's breach of fiduciary duty upon Plaintiff.

342.    Each of the aforementioned Defendants substantially assisted Defendant Stevan

Jospey in achieving his breaches of fiduciary duty by actively participating in (i) the stolen rebate

scheme, described herein above in paragraphs 75 to 87; (ii) the off-hours oil theft scheme,

described above in paragraphs 88 to 98; (iii) the Truck Sale Scheme, described above in

paragraphs 104 to 109; (iv) the Encore Scheme, described above in paragraphs 137 to 178; and (v)

the other acts of theft and fraud set forth herein.

343.    As a consequence of the foregoing, the Plaintiff is entitled to  damages in an

amount that cannot be determined, but according to proof at trial and inclusive of all legal fees

Plaintiff was forced to and continue to incur and the imposition of punitive damages in an amount

to be determined at trial.

## TWENTY-EIGHTH CAUSE OF ACTION
### (Fraud – Stevan Jospey)

344.    Plaintiff incorporates by reference each of the foregoing paragraphs 1-343, as if set

forth again in full.

345.    As operations manager and Vice President of Plaintiff, Defendant Stevan Jospey

was in charge of ordering product on behalf of Plaintiff.

346.    From time to time, Defendant Stevan Jospey would represent to Oscar Margolis that

Plaintiff required additional product to service its clients in the ordinary course of Plaintiff's

business.

347.    The foregoing representations were made to induce Plaintiff to purchase additional product.

348.    Based upon these representations, Defendant Stevan Jospey would order additional product, including fuel, oil, and lubricants, on behalf of Plaintiff, the cost of which would be billed to Plaintiff.

349.    The foregoing representations were false in that at least a portion of the products so ordered by Defendant Stevan Jospey for the purported account of Plaintiff were in reality being diverted to or for the benefit of Defendant Stevan Jospey, and to the detriment of Plaintiff.

350.    Defendant Stevan Jospey further defrauded Plaintiff through various acts of theft, including: (i) the stolen rebate scheme set forth above in Paragraphs 75 to 87; (ii) the off-hours oil theft scheme set forth above in Paragraphs 88 to 98; (iii) the credit card fraudulent charges scheme set forth above in Paragraphs 99 to 103; (iv) the truck sale scheme set forth above in Paragraphs 104 to 109; (v) the deleted invoices scheme and other cash thefts set forth above in Paragraphs 110 to 114; and (vi) the Encore scheme set forth above in Paragraphs 137 to 178.

351.    As operations manager and Vice President of Plaintiff exercising dominion and control over Plaintiff, Defendant Stevan Jospey possessed superior knowledge, not readily available to Plaintiff or its sole shareholder.

352.    Defendant Stevan Jospey knew that the Plaintiff was operating its business on the basis of mistaken knowledge, the truth of which Defendant Stevan Jospey actively attempted to conceal.

353.    The representations, acts and omissions of Defendant Stevan Jospey occurred intentionally, in willful and reckless disregard of the Plaintiff's rights, with the intention to defraud Plaintiff.

354.     The Plaintiff has been damaged thereby having incurred losses, including legal fees they were forced to and continue to incur, and all monetary and non-monetary losses that have resulted from Defendant Steve Jospey's conduct.

355.     Moreover, the foregoing wrongful acts occurred with the bad faith intention of causing harm to Plaintiff as to warrant the imposition of punitive damages.

356.     As a consequence of the foregoing, the Plaintiff is entitled to judgment awarding it compensatory damages in an amount that cannot be determined, but according to proof at trial and inclusive of all legal fees it was forced to and continue to incur and the imposition of punitive damages, in an amount to be determined at trial.

### TWENTY-NINTH CAUSE OF ACTION
**(Aiding and Abetting Fraud – Encore, Lebron, Romero, Quila-Moran, Lopez, Bass, Northeastern, D'Auria, Citilube, Advantage Environmental and Rosalyn Jospey)**

357.     Plaintiff incorporates by reference each of the foregoing paragraphs 1- 356, as if set forth again in full.

358.     Encore, Lebron, Romero, Quila-Moran, Lopez, Bass, Northeastern, D'Auria, Citilube, Advantage Environmental and Rosalyn Jospey, provided substantial assistance and aided and abetted Defendant Stevan Jospey's fraud by participating in the stolen rebate scheme, as set forth in detail above in Paragraphs 75 through 87, the off-hours oil theft scheme, as set forth in detail above in Paragraphs 88 through 98, the truck sale scheme, as set forth in detail above in Paragraphs 104 through 109, and the Encore scheme, as set forth in detail above in Paragraphs 137 through 178.

359.     Plaintiff has suffered damages, in an amount to be determined at trial, including legal fees they were forced to and continue to incur, and all monetary and non-monetary losses that have resulted from Defendants' acts.

360.   As a consequence of the foregoing the Plaintiff is entitled to judgment awarding them compensatory damages in an amount that cannot be determined, but according to proof at trial and inclusive of all legal fees they were forced to and continue to incur and the imposition of punitive damages in an amount to be determined at trial.

### THIRTIETH CAUSE OF ACTION
### (Injunction – Encore, Stevan Jospey and Luis Lebron)

361.   Plaintiff incorporates by reference each of the foregoing paragraphs 1-360, as if set forth again in full.

362.   Plaintiff is informed and believes and therefore alleges that defendant actually misappropriated and continues to threaten to misappropriate Plaintiff's trade secrets.

363.   Defendant has and will continue to wrongfully use Plaintiff's trade secrets unless enjoined.

364.   Defendant, by his fraudulent and deceitful conduct to date, has demonstrated that he cannot be counted on to avoid disclosing and utilizing Plaintiff's trade secrets.

365.   As a proximate result of Defendant's misappropriation and threatened misappropriation of Plaintiff's trade secrets, Plaintiff has suffered, and will continue to suffer, irreparable harm, as well as, damages in an amount to be proven at the time of trial, but which are substantial.

366.   Plaintiff has no adequate remedy at law and accordingly, seeks temporary, preliminary and permanent injunctive relief.  Plaintiff is threatened with losing customers, its competitive advantage, its trade secrets and goodwill in amounts that cannot be determined, unless Defendant is enjoined and restrained by this Court.

367.   Defendant's actual and threatened misappropriation has been willful and malicious and therefore, Plaintiff is entitled to an award of punitive or treble damages and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests entry of judgment against the Defendants as follows:

A. On Plaintiff's First Cause of Action against Defendant Encore:

    a.  Awarding Plaintiff a permanent injunction, enjoining and prohibiting Defendants, or their agents, servants, employees, officers, attorneys, successors and assigns from:

        i.  Using Silogram® trademark, or any version thereof, in connection with the description, marketing, promotion, advertising, or sale of any products or services; and

        ii.  Infringing on Silogram's Silogram® trademark;

    b.  Awarding Plaintiff damages in an amount to be determined at trial;

    c.  Awarding Plaintiff treble damages as provided by Section 35(a) of the Lanham Act and New York law;

    d.  Disgorging any profits Defendants have realized through their use of Plaintiff's trade names, and awarding Plaintiff relief in an amount to be determined at trial, and other appropriate relief;

    e.  Awarding Plaintiff the attorneys' fees and costs as provided by Section 35(a) of the Lanham Act and New York law;

B. On Plaintiff's Second Cause of Action against Encore:

    a.  Awarding Plaintiff a permanent injunction, enjoining and prohibiting Defendants, or their agents, servants, employees, officers, attorneys, successors and assigns from:

        i.  Using Silogram® trademark, or any version thereof, in connection with the description, marketing, promotion, advertising, or sale of any products or services; and

        ii.  Infringing on Silogram's Silogram® trademark;

    b.  Awarding Plaintiff damages in an amount to be determined at trial;

    c.  Awarding Plaintiff treble damages as provided by Section 35(a) of the Lanham Act and New York law;

    d.  Disgorging any profits Defendants have realized through their use of Plaintiff's trade names, and awarding Plaintiff relief in an amount to be determined at trial, and other appropriate relief;

    e.  Awarding Plaintiff the attorneys' fees and costs as provided by Section 35(a) of the Lanham Act and New York law;

C. On Plaintiff's Third Cause of Action against Defendants Stevan Jospey, Rosalyn Jospey, Luis Lebron and Encore:

    a.  Awarding Plaintiff a permanent injunction, enjoining and prohibiting Defendants, or their agents, servants, employees, officers, attorneys, successors and assigns from using Silogram's Trade Secret Information; and

    b.  Awarding Plaintiff damages in an amount to be determined at trial;

    c.  Disgorging any profits Defendants have realized through their use of Plaintiff's Trade Secret Information, and awarding Plaintiff relief in an amount to be determined at trial, and other appropriate relief;

D. On Plaintiff's Fourth Cause of Action against Encore:

    a.  Awarding Plaintiff a permanent injunction, enjoining and prohibiting Defendants, or their agents, servants, employees, officers, attorneys, successors and assigns from:

        i.  Using the Silogram name, or any version thereof, in connection with the description, marketing, promotion, advertising, or sale of any products or services; and

        ii.  Misappropriating Silogram's commercial advantage by using its skill, expenditures and labor to their own commercial advantage to promote, market, or sell Defendants' products in direct competition with Silogram;

    b.  Awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

    c.  Awarding Plaintiff exemplary damages in an amount to be determined at trial;

E. On Plaintiff's Fifth Cause of Action against Encore:

    a.  Awarding Plaintiff a permanent injunction, enjoining and prohibiting Defendants, or their agents, servants, employees, officers, attorneys, successors and assigns from:

        i.  Using Silogram® trademark, or any version thereof, in connection with the description, marketing, promotion, advertising, or sale of any products or services; and

        ii.  Infringing on Silogram's Silogram® trademark;

    b.  Awarding Plaintiff damages in an amount to be determined at trial;

    c.  Awarding Plaintiff treble damages as provided by New York law;

    d.  Disgorging any profits Defendants have realized through their use of Plaintiff's trade names, and awarding Plaintiff relief in an amount to be determined at trial, and other appropriate relief;

    e.  Awarding Plaintiff the attorneys' fees and costs as provided by New York law;

    f.  Awarding Plaintiff of punitive damages in an amount to be determined at trial;

F.  On Plaintiff's Sixth Cause of Action against Encore, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

G.  On Plaintiff's Seventh Cause of Action against Encore,

    a.  Awarding Plaintiff a permanent injunction, enjoining and prohibiting Defendants, or their agents, servants, employees, officers, attorneys, successors and assigns from:

        i.  Using Silogram® trademark, or any version thereof, in connection with the description, marketing, promotion, advertising, or sale of any products or services; and

        ii.  Infringing on Silogram's Silogram® trademark;

    b.  Awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

H.  On Plaintiff's Eighth Cause of Action against Stevan Jospey, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

I.  On Plaintiff's Ninth Cause of Action against Luis Lebron, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

J.  On Plaintiff's Tenth Cause of Action against William Bryant III, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

K.  On Plaintiff's Eleventh Cause of Action against Phoebe Ferentz, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

L.  On Plaintiff's Twelfth Cause of Action against Antoinette Rizzica, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

M.  On Plaintiff's Thirteenth Cause of Action against Alison Savo, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

N.  On Plaintiff's Fourteenth Cause of Action against Gary Moran, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

O.  On Plaintiff's Fifteenth Cause of Action against Ginger Berens, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

P.  On Plaintiff's Sixteenth Cause of Action against Rosalyn Jospey, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

Q.  On Plaintiff's Seventeenth Cause of Action against Grace Jospey, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

R.  On Plaintiff's Eighteenth Cause of Action against Encore, Stevan Jospey and Lebron:

    a.  Awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

    b.  Awarding Plaintiff Punitive damages in an amount according to proof at trial;

S.  On Plaintiff's Nineteenth Cause of Action against Stevan Jospey and Rosalyn Jospey, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

T.  On Plaintiff's Twentieth Cause of Action against Stevan Jospey and Advantage Environmental, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

U.  On Plaintiff's Twenty-first Cause of Action against Stevan Jospey, Northeastern, D'Auria, Wilson, Romero, Quila-Moran and Lopez awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

V.  On Plaintiff's Twenty-second Cause of Action against Stevan Jospey, Citilube and Bass, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

W. On Plaintiff's Twenty-third Cause of Action against Stevan Jospey, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

X. On Plaintiff's Twenty-fourth Cause of Action against Stevan Jospey, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

Y. On Plaintiff's Twenty-fifth Cause of Action against Stevan Jospey, an accounting of all transfers of Plaintiff assets, including accounts receivable, made to or for the benefit of Defendant Stevan Jospey;

Z. On Plaintiff's Twenty-sixth Cause of Action against Stevan Jospey and all Former Employee Defendants, awarding Plaintiff repayment of all compensation received by Defendant Stevan Jospey and each of the Former Employee Defendants, whether in the form of salary, bonus, or other payments;

AA.   On Plaintiff's Twenty-seventh Cause of Action against Encore, Lebron, Romero, Moran, Lopez, Bass, Northeastern, D'Auria, Citilube, Advantage Environmental and Rosalyn Jospey, awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

BB.   On Plaintiff's Twenty-eighth Cause of Action against Stevan Jospey:

    a. Awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

    b. Awarding Plaintiff Punitive damages in an amount according to proof at trial;

CC.   On Plaintiff's Twenty-ninth Cause of Action against Encore, Lebron, Romero, Quila-Moran, Lopez, Bass, Northeastern, D'Auria, Citilube, Advantage Environmental and Rosalyn Jospey:

    a. Awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

    b. Awarding Plaintiff Punitive damages in an amount according to proof at trial;

DD.   On Plaintiff's Thirtieth Cause of Action against Encore, Stevan Jospey and Luis Lebron:

    a. Awarding Plaintiff a permanent injunction, enjoining and prohibiting Defendants, or their agents, servants, employees, officers, attorneys, successors and assigns from misappropriating Plaintiff's trade secrets;

    b. Awarding Plaintiff damages in an amount to be determined at trial, including appropriate attorneys' fees, costs and expenses, and other appropriate relief;

c. Awarding Plaintiff Punitive damages in an amount according to proof at trial; and

EE. Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York
       January 3, 2014

WHITE & WOLNERMAN, PLLC

By: _____
    David Y. Wolnerman, Esq.
    Randolph E. White, Esq.
    110 E. 59th Street, 25th Floor
    New York, New York 10022
    Phone: (212) 308-0667
    Fax: (212) 308-7090

*Attorneys for Plaintiff*

61